## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **VICTOR A.,**[1] | |
| **Plaintiff,** | |
| **v.** | **Case No. 3:23-CV-3800-NJR** |
| **COMMISSIONER OF SOCIAL SECURITY,** | |
| **Defendant.** | |

## <u>MEMORANDUM AND ORDER</u>

**ROSENSTENGEL, Chief Judge:**

Plaintiff Victor A. ("Plaintiff") appeals to the district court from a final decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits ("DIB"). For the following reasons, the Commissioner's decision is reversed and remanded for rehearing and reconsideration of the evidence.

### PROCEDURAL HISTORY

Plaintiff applied for DIB on March 8, 2022, alleging a disability onset date of January 14, 2022.[2] (Tr. 15). Plaintiff based his claim on his diagnoses of asthma, high cholesterol, major depressive disorder with psychotic features, fatigue, general anxiety disorder, and auditory hallucinations. (Tr. 60, 209). He also stated that the U.S. Department of Veterans Affairs ("VA") determined him to be 100 percent disabled. (*Id.*).

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See FED. R. CIV. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] Plaintiff initially alleged disability beginning November 30, 2014, but amended his onset date to January 14, 2022, at the hearing before the ALJ. (Tr. 38-39).

Plaintiff's claim was denied initially on September 12, 2022, and upon reconsideration on January 5, 2023. (Tr. 59). On June 29, 2023, Plaintiff requested a hearing, which was held before Administrative Law Judge Robert Luetkenhaus ("ALJ"). (Tr. 33-58). On August 15, 2023, the ALJ issued an unfavorable decision, finding Plaintiff was not disabled. (Tr. 12-27). The Appeals Council denied Plaintiff's request for review on September 29, 2023, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-6).

Plaintiff now appeals the denial of DIB directly to this Court. He raises two issues: (1) whether the ALJ failed to properly evaluate his credibility; and (2) whether the ALJ failed to properly evaluate residual functional capacity. (Doc. 18). The Commissioner filed a brief in opposition. (Doc. 25).

## STANDARD OF REVIEW

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." *Id.* The Supreme Court defines substantial evidence as "more than a mere scintilla, and means only such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

"An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and his conclusions." *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021)). The reviewing court may not "reweigh the evidence, resolve

debatable evidentiary conflicts, determine credibility, or substitute [its] judgment for the

ALJ's determination so long as substantial evidence supports it." *Gedatus v. Saul*, 994 F.3d

893, 900 (7th Cir. 2021). Where an ALJ ignores a whole line of evidence contrary to the

ruling, however, a district court cannot assess whether the ruling rested on substantial

evidence and must remand to the agency. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th

Cir. 2003).

### DISABILITY UNDER THE SOCIAL SECURITY ACT

To qualify for DIB, a claimant must be disabled within the meaning of the

applicable statutes. Under the Social Security Act, a person is disabled if he has an

"inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than twelve

months." 42 U.S.C. § 423(d)(1)(a). "A claimant need not be disabled at the date of his

hearing; rather, he qualifies for benefits if a disability existed for any consecutive twelve-

month period during the relevant time frame." *Mara S. on behalf of C.S. v. Kijakazi*, No. 19-

CV-8015, 2022 WL 4329033, at *8 (N.D. Ill. Sept. 19, 2022) (citing 20 C.F.R. § 404.320(b)(3)).

A "physical or mental impairment" is an impairment resulting from anatomical,

physiological, or psychological abnormalities demonstrated by accepted diagnostic

techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that

involves doing significant physical or mental activities and that is done for pay or profit.

20 C.F.R. § 404.1572.

At a Social Security hearing, an ALJ uses a five-step evaluation to assess whether

a claimant may engage in substantial gainful activity. *Milhem v. Kijakazi*, 52 F.4th 688, 691

(7th Cir. 2022). The ALJ asks whether:

1.    the claimant is presently employed;

2.    the claimant has a severe impairment or combination of impairments;

3.    the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity;

4.    the claimant's residual functional capacity leaves him unable to perform his past relevant work; and

5.    the claimant is unable to perform any other work existing in significant numbers in the national economy. *Id.*

The claimant bears the burden of proof at steps one through four. *Id.* Once the

claimant shows an inability to perform past work, the burden shifts to the Commissioner

to show the claimant's ability to engage in other work existing in significant numbers in

the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

## EVIDENTIARY RECORD

The Court has reviewed and considered the entire evidentiary record in preparing

this Memorandum and Order. The following summary of the record is limited to the

points raised by Plaintiff.

## I.    Relevant Medical Records

Plaintiff served in the U.S. Air Force from 2010 to 2014, where he claims he was

abused. (Tr. 862). In 2015, Plaintiff began seeing William Irvin, Jr., M.D., a physician at

the VA Medical Center in St. Louis, Missouri, every one to three months for anxiety and

stress resulting from his time in the military. (Tr. 307, 589). Dr. Irvin diagnosed Plaintiff

with anxiety disorder and major depressive disorder, recurrent, with psychotic features. (Tr. 589). In 2019 and 2020, Plaintiff had inpatient hospital stays related to his mental health. (Tr. 198). In March 2020, Dr. Irvin wrote that Plaintiff's illness had recently become disabling such that it severely impaired his social and occupational functioning and prevented him from engaging in gainful employment. (Tr. 298).

The VA, which had previously assessed Plaintiff as 30 percent disabled due to his major depressive disorder, increased his disability level to 100 percent effective January 17, 2020. (Tr. 301, 587). The VA made the finding that Plaintiff is not employable due to— among other things—his occupational and social impairment, suspiciousness, persistent danger of hurting others and/or himself, depressed mood, suicidal ideation, persistent delusions, chronic sleep impairment, near-continuous depression and panic, persistent hallucinations, difficulty adapting to stressful situations, neglect of personal appearance and hygiene, difficulty adapting to work, difficulty in establishing and maintaining work and social relationships, and intermittent ability to perform the activities of daily living. (*Id.*). The VA further noted that Plaintiff had been hospitalized twice at a VA hospital due to his suicidal ideation and auditory hallucinations of people laughing at him. (Tr. 302).

On February 27, 2021, Plaintiff had a telehealth appointment with Dr. Irvin related to his mental health. (Tr. 856). Plaintiff reported "hanging in there" with a fair mood. (*Id.*). Plaintiff stated he had learned to cope with suicidal thoughts when they occurred. (*Id.*). Dr. Irvin performed a mental status exam ("MSE") and found Plaintiff to be cooperative with elicitable speech, organized thoughts, and no flight of ideas, loose associations, circumstantiality, or blocking. (*Id.*). Dr. Irvin again diagnosed Plaintiff with general

anxiety disorder and major depressive disorder, recurrent, with psychotic features, and he renewed Plaintiff's prescriptions for aripiprazole, atorvastatin, bupropion, hydroxyzine, and sertraline. (*Id.*).

Dr. Irvin had another telehealth appointment with Plaintiff on August 3, 2021. (Tr. 834-35). Plaintiff reported wanting to move on with his life instead of sleeping all the time. (*Id.*). Plaintiff had began taking an old prescription for Adderall and found that it gave him more energy, along with good sleep and an appetite. (*Id.*). Plaintiff reported the same at an in-person visit with Dr. Irvin on August 16, 2021. (Tr. 809).

In October 2021, Plaintiff reported that he was working a telework job and was "just trying to keep [his] sanity now." (Tr. 476). He found the job stressful and had lost 10 pounds in a few weeks. (*Id.*). Upon examination of Plaintiff's mental status, Dr. Irvin found him cooperative but stressed. (*Id.*). His speech was elicitable and directable, his thoughts were organized without flight of ideas, loose associations, circumstantiality, or blocking. (*Id.*). Plaintiff denied suicidal ideations, but acknowledged occasional auditory hallucinations that were "not as bad as before." (*Id.*). On January 20, 2022, Plaintiff called to tell Dr. Irvin he quit the job because it became too stressful.[3] (*Id.*). Two days later, Plaintiff met with Dr. Irvin and explained his mood was depressed and anxious. (Tr. 766). He also said his wife was pregnant, which caused him to worry more, and talked of decreased hope and increased suspicions. (*Id.*). Dr. Irvin discussed the risks, benefits, and side effects of adding mirtazapine to Plaintiff's medications, and he referred Plaintiff to individual psychotherapy. (*Id.*).

---

[3]  Plaintiff quit his job on January 13, 2022, leading to his disability onset date of January 14, 2022.

During a February 2022 telehealth appointment, Plaintiff told Dr. Irvin he remained depressed, was isolated at home, had low motivation, was sleeping a lot, and had auditory hallucinations. (Tr. 755). Dr. Irvin discussed the indications, risks, benefits, side effects and alternatives of transcranial magnetic therapy ("TMS"). (*Id.*).

By March 2022, Dr. Irvin reported that Plaintiff had anxiety due to world events, had auditory hallucinations of ambulances, and talked about losing multiple jobs due to his anxiety and not trusting people. (*Id.*). Dr. Irvin assessed Plaintiff as cooperative but stressed with clear speech and organized thoughts. (*Id.*). His insight and judgment were fair; he denied suicidal ideation, but he still had some auditory hallucinations. (*Id.*).

That same day, Plaintiff had a consult with Katherine Garanzini, MSW, LCSW. (Tr. 1037). Garanzini evaluated Plaintiff's suicide risk and noted his most recent suicidal ideation was 30 to 90 days ago. (*Id.*). While he did not have current suicidal intent, he had access to lethal means and had behavioral warning signs including anxiety, hopelessness, sleep disturbance, extreme stress, and a history of mental health hospitalization. (Tr. 1038). Garanzini found Plaintiff had a low acute risk for suicide but a moderate chronic risk. (*Id.*). Garanzini also evaluated Plaintiff for mental health services at the VA's Psychosocial Rehabilitation and Recovery Center. (Tr. 1040). She diagnosed Plaintiff with adjustment disorder, unspecified, related to stress from his inability to maintain work. (Tr. 1047). As of that date, Plaintiff was prescribed albuterol, aripiprazole, atorvastatin, bupropion, finasteride, lorazepam, mirtazapine, and sertraline. (Tr. 1049).

On April 7, 2022, Social Worker Jessica Holdinghaus called Plaintiff to determine the urgency of his mental health needs. (Tr. 400). Plaintiff reported worsening symptoms

over the past several months and that he often has low level, but chronic, thoughts of suicide. (*Id.*). Plaintiff stated that the war in Ukraine had worsened his depression and symptoms of paranoia. (*Id.*). Plaintiff considered inpatient psychiatric care, but he worried about leaving his pregnant wife at home. (*Id.*).

On April 15, 2022, Social Worker Amanda Schoeck held a telehealth appointment with Plaintiff where he explained his suicidal ideation and his auditory hallucinations, including sirens, air raid noises, and people whispering. (Tr. 328). Plaintiff stated that the hallucinations cause him physical distress and impair his ability to work. (*Id.*). He also requested one-on-one therapy. (Tr. 402). Schoeck determined Plaintiff was not at imminent risk of harm to himself or others at that time. (Tr. 403).

As part of Plaintiff's disability application, Dr. Irvin was asked to compete an assessment of Plaintiff's mental health in April 2022. Dr. Irvin noted Plaintiff's diagnoses of anxiety disorder and major depressive disorder, recurrent, with psychotic features. (Tr. 589). Plaintiff's symptoms included personality change, mood disturbance, hallucinations, loss of interests, paranoia, feelings of worthlessness, difficulty thinking or concentrating, suicidal ideations, societal withdrawal, blunt affect, persistent irrational fears, and generalized anxiety. (*Id.*). Dr. Irvin noted that Plaintiff is not a malingerer and that he had a limited response to medications and psychotherapy. (*Id.*). He also stated that Plaintiff's prognosis was guarded and his impairments were expected to last at least 12 months. (*Id.*).

According to Dr. Irvin, Plaintiff would have difficulty working a full-time job due to his anxiety and suspiciousness of others. (*Id.*). Additionally, Plaintiff would be off task

more than 20 percent of the workday, he would require redirection one to two times per hour, and he would be absent more than three days per month. (Tr. 590). Dr. Irvin found Plaintiff's mental impairments caused extreme restrictions in his activities of daily living, extreme difficulties in maintaining social functioning, constant difficulties in maintaining concentration, persistence, or pace, and constant episodes of decompensation. (*Id.*).

On June 24, 2022, Ericka Swanson, Psy.D., performed a psychological consultative examination (CE) on behalf the Commissioner. (Tr. 862). Plaintiff stated that he used to have hobbies that he no longer participates in, he no longer has friends, and he doesn't go out anywhere. (Tr. 862-63). He also reported sleeping 16 hours a day until his baby was born and feeling "like a vegetable." (Tr. 863). Plaintiff again endorsed having auditory hallucinations including people laughing at him. (Tr. 865). Dr. Swanson diagnosed Plaintiff with historical and current presentation of major depressive disorder, recurrent, with psychotic features. (Tr. 866). She found that Plaintiff "cannot likely manage their own funds." (*Id.*).

On June 30, 2022, Social Worker Holdinghaus administered the Patient Health Questionnaire-9 related to Plaintiff's depressive symptoms. (Tr. 907). Over the previous two weeks, Plaintiff reported feeling little interest or pleasure; feeling down, depressed, or hopeless; trouble sleeping; tired, low energy; poor appetite; and feelings of failure or guilt nearly every day. (*Id.*). He reported having trouble concentrating; motor retardation; agitation; and thoughts of being better off dead/hurting himself more than half of the days. (*Id.*). His score indicated severe depressive symptoms that made it extremely difficult to work, take care of things at home, or get along with others. (*Id.*). Holdinghaus

also administered the GAD-7 for anxiety symptoms, the results of which were consistent with severe symptoms of anxiety. (*Id.*).

Irim Massay, M.D., performed an internal medicine CE at the request of the Commissioner on July 11, 2022. Plaintiff told Dr. Massay he is unable to cook, clean, do laundry, or shop due to lack of energy or motivation. (Tr. 869). He watches his child, but his wife does all of the caretaking. (*Id.*). He must shower in complete darkness. (*Id.*). He also does not socialize with people. (Tr. 870).

In November 2022, Dr. Irvin saw Plaintiff, who said his mood was variable and his sleep was not great. (Tr. 1464). Dr. Irvin increased Plaintiff's dosage of mirtazapine to 45 mg. (*Id.*).

Plaintiff requested a referral to treat his medication-resistant depression with TMS, but he did not go through with the procedure due to anxiety about it. (Tr. 330, 1442).

## II.    State Agency Examiners

On September 7, 2022, James Hinchen, M.D., evaluated Plaintiff for his physical ailments. (Tr. 62). Dr. Hinchen diagnosed Plaintiff with exercised-induced asthma, high cholesterol, and fatigue associated with a diagnosis of major depressive disorder. He found Plaintiff's diagnoses were non-severe and that Plaintiff was subject to environmental limitations only. (*Id.*). James Madison, M.D., concluded the same on reconsideration. (Tr. 73).

Plaintiff also was evaluated by Russell Taylor, Ph.D. (Tr. 63-68). Dr. Taylor noted Plaintiff arrived on time, was alert and engaged, was neatly groomed, and was cooperative and pleasant. (Tr. 64). Plaintiff's mood was stable, with no signs of psychosis.

(*Id.*). Dr. Taylor found that Plaintiff alleges cognitive limitations beyond what the objective evidence supports. (*Id.*). Dr. Taylor concluded that Plaintiff has the mental capacity to understand, remember, concentrate, and persist sufficiently in order to carry out simple, routine instructions for a normal work period. (Tr. 68). Plaintiff also could interact with others in a work setting with reduced social demands, but would do best in a predictable, routine work setting where employment-related social interactions are infrequent, brief, and largely task-specific in focus. (*Id.*). While Plaintiff could adapt to simple, routine changes and pressures, Dr. Taylor found that he would do best in a work setting with only occasional changes in work settings and with no fast-paced production requirements. (*Id.*). Finally, Dr. Taylor found Plaintiff can tolerate normal production work but would have difficulty tolerating jobs requiring significantly higher than average pace. (*Id.*). Joseph Mehr, Ph.D., reiterated the same conclusions at the reconsideration level. (Tr. 73-78).

## III.   Evidentiary Hearing

Plaintiff appeared via telephone and was represented by counsel at the hearing before the ALJ on February 7, 2023. (Tr. 33-58). Vocational expert Brenda Young also appeared by telephone. (*Id.*)

Plaintiff was 37 years old at the time of the hearing. (Tr. 42). He earned a Bachelor of Science degree in electrical engineering from Saint Louis University and had been in training to be a patent examiner with the U.S. Patent and Trademark Office (USPTO). (Tr. 44-46). Plaintiff explained that a job as a patent examiner is highly technical and very demanding, and he became extremely overwhelmed and stressed at work. (Tr. 45-46).

Plaintiff also testified that he could not work a less demanding, simple, repetitive job because he hears sounds all day like people laughing at him. (Tr. 47). Although he has been prescribed medication, it does not always help. (*Id.*). Plaintiff stated that he has panic attacks three or four times a week that cause him to become very sad and tearful. (Tr. 48, 52). Plaintiff's symptoms also affect his ability to concentrate on his tasks. (Tr. 53). He testified that he feels like a cloud of smoke is following him everywhere, not allowing him to think straight. (*Id.*). That feeling, combined with the voices and laughter he hears, affects his ability to focus. (*Id.*). Plaintiff further testified that he does not have any issues with his asthma as long as he uses his albuterol inhaler. (Tr. 47-48).

With regard to his home life, Plaintiff testified that he sleeps until 1 p.m. most days and wakes up only to see his young son. (Tr. 49). His wife does everything, including cooking, cleaning, shopping, and taking care of their son. (*Id.*). Plaintiff does not help with anything. (*Id.*).

According to Plaintiff, he gets into confrontations with coworkers and managers when he tries to work because it gives him flashbacks of being in the Air Force, where he was abused. (Tr. 45-46). Since leaving the Air Force, Plaintiff has been banned from a gym, two to three tire shops, and a community college. (Tr. 51). He also was charged with trespassing at the Los Angeles airport, but that was later dismissed. (*Id.*).

Plaintiff testified that he has asked his doctor at the VA about other treatment options so that he can get better. (Tr. 52). Plaintiff was going to try TMS, but he started panicking about it when he learned they would send electricity to his brain. (Tr. 53). Thus, Plaintiff did not go through with the procedure. (*Id.*).

The ALJ then asked the Vocational Expert (VE) to consider a hypothetical
involving a younger person who has completed at least high school and has no exertional
limitations but must avoid concentrated exposure to dust, odor, fumes, and pulmonary
irritants. (Tr. 55). The VE was asked if there are jobs this hypothetical person could do,
presuming the individual can perform only simple routine and repetitive tasks requiring
simple work related decisions, few changes in the work routine, and no more than
occasional interaction with supervisors, coworkers, and the general public. (*Id.*). The VE
testified that this individual could work as a Hand Packager, Material Handler, or
Laundry Worker. (Tr. *Id.*). However, she testified the hypothetical individual could not
work these jobs—or any jobs—if the person was off task for 20 percent of the workday or
absent from work three times per month. (*Id.*). She also stated that being off task for more
than 10 percent of the day and absent more than once a month, and not every month
consecutively, would prohibit competitive work. (*Id.*).

### DECISION OF THE ALJ

In reaching his decision, the ALJ considered the entire record.

At step one, the ALJ concluded Plaintiff had not engaged in substantial gainful
activity since his alleged amended onset date of January 14, 2022. (Tr. 17).

At step two, the ALJ concluded that Plaintiff had the following severe
impairments: major depressive disorder, generalized anxiety disorder, posttraumatic
stress disorder (PTSD), and asthma. (Tr. 18). The ALJ noted that these medically
determinable impairments significantly limit Plaintiff's ability to perform basic work
activities. (*Id.*). The ALJ also found that Plaintiff has medically determinable impairments

of right shoulder bursitis and hyperlipidemia (high cholesterol), but he determined these impairments did not cause more than a minimal limitation in Plaintiff's ability to perform basic work activities. (*Id.*).

At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in the SSA regulations. (*Id.*). The ALJ found Plaintiff has a mild limitation as to remembering or applying information. (*Id.*). The ALJ determined Plaintiff has a moderate limitation with regard to interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. (Tr. 19).

In coming to these conclusions, the ALJ considered Plaintiff's major depressive disorder with psychotic features, anxiety, fatigue, and auditory hallucinations, along with Plaintiff's reported suicidal ideation, lack of motivation, sleeping 15 to 16 hours a day to escape life, and weekly panic attacks. (*Id.*). He also considered Plaintiff's testimony that his wife takes care of their child and dog, and that he has difficulty with regard to personal care, preparing meals, performing house and yard work, and going outside. (*Id.*). The ALJ further noted Plaintiff's reported difficulty with completing tasks, concentrating, and following instructions; getting along with others including authority figures; and handling stress and changes in routine. (*Id.*).

At the same time, however, the ALJ noted Plaintiff's testimony that he can read, write, manage medical care, attend doctors' appointments, drive on occasion, go out alone, and manage funds. (*Id.*). Further, although Plaintiff's MSEs often showed a stressed, depressed, and sad mood, a flat or constricted affect, suspicious thinking, fair to

poor insight and judgment, and auditory hallucinations, the MSEs otherwise generally showed an alert and oriented sensorium, a cooperative/pleasant demeanor, good grooming and hygiene, good eye contact, normal psychomotor activity, normal speech, intact cognition, no suicidal or homicidal ideation, and an organized/goal-directed/logical/linear thought process without flight of ideas, loose associations, circumstantiality, delusions, or blocking. (Tr. 19-20).

At step four, the ALJ found that Plaintiff has the RFC to perform a full range of work at all exertional levels but with the following non-exertional limitations: he must avoid concentrated exposure to dusts, odors, fumes, and pulmonary irritants; and he can perform only simple, routine, and repetitive tasks, requiring only simple work-related decisions, with few changes in the routine work setting, and no more than occasional interaction with supervisors, co-workers, and the general public. (Tr. 20).

The ALJ reasoned that while Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, his statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record. (Tr. 21-22).

With regard to the objective medical evidence, including MSEs, the ALJ found the records did not demonstrate a disabling limitation. (Tr. 22). The ALJ acknowledged that Dr. Irvin diagnosed Plaintiff with adjustment disorder, generalized anxiety disorder, and severe major depressive disorder with psychosis and that Plaintiff was treated with psychotherapy and psychotropic medications. (*Id.*). He further noted that Plaintiff reported depression, stress, anxiety, occasional auditory hallucinations, distrust of

people, verbal aggression, and social isolation. (*Id.*). Finally, the ALJ recognized that Plaintiff's depression screening, at times, showed severe depressive symptoms, and that his MSEs often show stressed/depressed mood, flat/blunt affect, suspicious thinking, fair to poor insight and judgment, and auditory hallucinations. (*Id.*). On the other hand, these MSEs "otherwise generally showed good grooming, alert and oriented sensorium, appropriate eye contact, normal motor activity, normal speech, sad mood, constricted affect, goal-directed, logical, and linear thought process, fair insight, intact judgment, intact cognitions, and normal thought content with no suicidal/homicidal ideation, hallucinations, or delusions." (*Id.*).

The ALJ noted Dr. Swanson's CE, but stated that she did not discuss her findings or provide an opinion as to any potential mental functioning limitations. (*Id.*).

With regard to Plaintiff's consultation with for TMS for depression that had failed to respond to multiple medication trials and/or psychotherapy, the ALJ found there was "nothing in the record after the initial consultation, so it is unclear whether the claimant continued to pursue this treatment." (Tr. 23). Again, the ALJ noted Plaintiff's MSE at that time, which showed good grooming, alert and oriented sensorium, appropriate eye contact, normal motor activity, normal speech, sad mood, constricted affect, goal-directed, logical, and linear thought process, fair insight, intact judgment, intact cognitions, and normal thought content with no suicidal/homicidal ideation, hallucinations, or delusions. (*Id.*).

The ALJ did not defer or give any specific evidentiary weight to the medical opinions and prior administrative medical findings. (*Id.*). He determined the prior

administrative findings of Dr. Hinchen and Dr. Madison that Plaintiff's asthma is a non-severe impairment to be unpersuasive because that opinion is not consistent with the record as a whole. (*Id.*). He determined the administrative findings of Dr. Taylor and Dr. Mehr as to Plaintiff's moderate mental health limitations were persuasive because their opinions were supported by their respective professional medical knowledge, review of the record, and citations to the record, and were generally consistent with the record as a whole. (Tr. 24). The ALJ also found these doctors' opinions to be consistent with Plaintiff's MSEs. (Tr. 24).

The ALJ was unpersuaded by Dr. Irvin's March 2020 opinion that Plaintiff's illness had persisted and become disabling such that it severely impaired Plaintiff's social and occupational functioning and prevented him from engaging in gainful employment. (Tr. 25). Even though this opinion was supported by "Dr. Irvin's professional psychiatric knowledge and long-standing, first-hand treatment" of Plaintiff, the ALJ found the opinions were not supported by citations to the record, Dr. Irvin's own exam findings, or the findings of Plaintiff's mental status exams, which were "essentially normal" aside from a depressed mood, poor insight and judgment, and auditory hallucinations. (*Id.*). The ALJ also was not persuaded by the VA's assessment of Plaintiff's disability level since determinations of disability made by other agencies, like the VA, are not binding on the SSA. (*Id.*).

The ALJ was further unpersuaded by Dr. Irvin's April 2022 assessment of Plaintiff's extreme and moderate limitations, as well as his opinion that Plaintiff has had limited response to medication and psychotherapy, has difficulty working around others

due to anxiety and suspiciousness, on average would be off task more than 20 percent of an 8-hour workday, and would miss work more than three times a month. (Tr. 25). Again, the ALJ concluded that despite being supported by Dr. Irvin's professional psychiatric knowledge and long-standing first-hand treatment of the claimant, his opinion was not supported by his own exam findings and was not consistent with the record as a whole, including Plaintiff's MSEs. (*Id.*).

In sum, the ALJ found Plaintiff is capable of performing work at all exertional levels, although his mental health impairments limit him to performing only simple, routine, and repetitive tasks that require only simple work-related decisions, with few changes in the routine work setting, and no more than occasional interaction with supervisors, co-workers, and the general public. (Tr. 26).

At step five, the ALJ then found that, considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant number in the national economy that Plaintiff can perform—including hand packager, material handler, and laundry worker. (Tr. 26-27).

For these reasons, the ALJ found that Plaintiff is "not disabled." (Tr. 27).

DISCUSSION

1.    **Whether the ALJ failed to properly evaluate credibility.**

On appeal, Plaintiff first argues that the ALJ improperly discounted his testimony regarding his subjective symptoms. The ALJ listed Plaintiff's impairments, including his suicidal ideation, lack of motivation, sleeping 15 to 16 hours per day "to escape life," anxiety, distrust of people, auditory hallucinations, frequent confrontations with

customers, coworkers and supervisors, a fear of leaving his house, difficulty with concentration, an inability to do anything at home, and difficulty following instructions and handling stress and changes in routine. Nonetheless, the ALJ found Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms not entirely consistent with the medical evidence and other evidence in the record.

Plaintiff asserts that the ALJ did not cite to any evidence contradicting Plaintiff's testimony, instead finding that Plaintiff can read, write, manage medical care, attend doctors' appointments, drive on occasion, go out alone, and manage funds. But the ALJ failed to explain how any of these activities prove Plaintiff can maintain full-time, competitive employment. Plaintiff testified that, even though he can physically go out alone, he is afraid to leave his house. Moreover, the fact that Plaintiff has attended doctors' appointments should have no bearing on his ability to work. Many of the appointments were telehealth appointments, and if Plaintiff had not sought treatment, the ALJ would have found him not disabled for lack of medical evidence to support his claim.

Moreover, Plaintiff argues, while the ALJ cited to the findings of his MSEs, those findings actually support rather than undermine his credibility. The MSEs often showed his stressed/depressed/sad mood, flat/blunt/constricted affect, suspicious thinking, fair to poor insight and judgment, and auditory hallucinations, which are supported by the objective medical evidence.

In response, the Commissioner avers that the ALJ properly and reasonably evaluated Plaintiff's subjective symptoms when he considered them in conjunction with

Plaintiff's daily activities and the objective medical evidence. The Commissioner argues that the ALJ was not required to accept Dr. Irvin's opinion on the ultimate question of disability when Dr. Irvin did not provide citations to the medical evidence and his own treatment notes showed Plaintiff's MSEs were "generally normal with the exception of depressed mood, poor insight and judgment, and auditory hallucinations."

An ALJ's evaluation of a claimant's subjective symptoms should be overturned only if it is "patently wrong, which means that the decision lacks any explanation or support." *Hess v. O'Malley*, 92 F.4th 671, 679 (7th Cir. 2024) (quoting *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014)). "But when a credibility finding rests on 'objective factors or fundamental implausibilities,' rather than on a claimant's demeanor or other subjective factors, [a court has] greater leeway to evaluate the ALJ's determination. *Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013) (quoting *Schomas v. Colvin*, 732 F.3d 702, 708 (7th Cir. 2013)).

Here, the ALJ discounted Plaintiff's subjective symptoms because he found that Plaintiff can read and write, manage his medical care, attend doctors' appointments, drive on occasion, go out alone, and manage funds. But Plaintiff's disability claim was never based on an inability to read or write. Furthermore, many of Plaintiff's doctor visits were conducted via telehealth appointments, and at least one doctor, Dr. Swanson, determined Plaintiff cannot manage his own funds.

The ALJ also cherry-picked findings from Plaintiff's MSEs and asserted they were "essentially normal," including the findings that Plaintiff had good grooming, alert and oriented sensorium, appropriate eye contact, normal motor activity, normal speech, and

a logical and linear thought process with no current suicidal or homicidal ideations. But an ALJ cannot rely only on the evidence that supports his opinion. *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013). In choosing to credit those findings, the ALJ ignored the objective findings that Plaintiff had a stressed, depressed, and sad mood, a flat or constricted affect, suspicious thinking, fair to poor insight and judgment, and auditory hallucinations—symptoms that are not "essentially normal."

The Seventh Circuit has "repeatedly held that although an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting [his] ultimate conclusion while ignoring the evidence that undermines it." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014). And an ALJ cannot cherry-pick records from Plaintiff's "good days," ignoring his bad days and how those symptoms would limit his ability to work. *See Farrell v. Astrue*, 692 F.3d 767, 773 (7th Cir. 2012).

Furthermore, as the Seventh Circuit has stated, it is "illogical to dismiss the professional opinion of an examining psychiatrist or psychologist simply because that opinion draws from the claimant's reported symptoms." *Aurand v. Colvin*, 654 F. App'x 831, 837 (7th Cir. 2016). Often, objective medical evidence is not available to support mental health diagnoses. *Id.* ("[A] psychological assessment is by necessity based on the patient's report of symptoms and responses to questioning; there is no blood test for bipolar disorder."). Moreover, "[m]ental-health assessments normally are based on what the patient says, but only after the doctor assesses those complaints through the objective lens of her professional expertise." *Mischler v. Berryhill*, 766 F. App'x 369, 375 (7th Cir. 2019); *but see Prill v. Kijakazi*, 23 F.4th 738, 751 (7th Cir. 2022) (permissible for ALJ to

discount a physician's opinion based primarily on subjective complaints as to *physical* health symptoms).

An ALJ's decision to discount a mental health opinion can be reasonable when there is no indication the mental health professional used their objective lens of professional expertise in evaluating the subjective reports and complaints. *Behlman v. Saul*, No. 19-C-1147, 2020 WL 6889187, at *5 (E.D. Wis. Nov. 24, 2020). But that is not the case here. Dr. Irvin has treated Plaintiff since 2015, and there is no indication that he substituted Plaintiff's subjective complaints for his own professional judgment. The ALJ also ignored or disregarded the findings of Dr. Swanson, who diagnosed Plaintiff with historical and current presentation of major depressive disorder, recurrent, with psychotic features and found that Plaintiff cannot likely manage his own funds.

While the Court understands it cannot reweigh the evidence, the ALJ also cannot ignore a whole line of evidence. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003). Respectfully, the ALJ's opinion that Plaintiff's mental status exams were "essentially normal" and that he is not disabled is not supported by substantial evidence.

## 2.    Whether the ALJ failed to properly evaluate residual functional capacity.

Plaintiff next argues that although the ALJ found Plaintiff has a moderate limitation in the area of concentrating, persisting, or maintaining pace, he did not account for this moderate limitation in his RFC assessment. Instead, the ALJ found that Plaintiff "can perform only simple, routine, and repetitive tasks, requiring only simple work related decisions, with few changes in the routine work setting, and no more than occasional interaction with supervisors, co-workers, and the general public." (Tr. 20).

In response, the Commissioner argues that the ALJ's assessment of Plaintiff's work abilities is supported by substantial evidence. Specifically, in 2017, the SSA revised the mental impairment regulations to define "moderate limitation" to mean an individual's ability to sustain independent, appropriate, and effective activities within one of the functional categories is "fair." Thus, since 2019, the Seventh Circuit has affirmed nearly every ALJ decision where the claimant had a moderate rating in the area of concentrating, persisting, or maintaining pace and the ALJ's RFC included evidence-based limitations, like simple, repetitive tasks.[4] Moreover, Plaintiff has not specified what additional limitations the ALJ should have assessed, nor has he pointed to evidence in the record supporting those additional limitation.

The RFC is a measure of what an individual can do despite the limitations imposed by his impairments. *Joseph W. v. O'Malley*, No. 23-CV-3084-SMY, 2024 WL 4143613, at *4 (S.D. Ill. Sept. 11, 2024) (citing 20 C.F.R. § 404.1545(a)). It is "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities," *id.*, and must be supported by substantial evidence. *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).

"When determining the RFC, an ALJ must incorporate all of a claimant's functional limitations supported by the medical record. *Streikus v. O'Malley*, No. 22-2484, 2024 WL 983568, at *4 (7th Cir. Mar. 7, 2024) (citing *Varga v. Colvin*, 794 F.3d 809, 813 (7th

---

[4] The cases cited by the Commissioner are distinguishable. For example, in *Langley v. O'Malley*, No. 22-3008, 2024 WL 3649021, at *4 (7th Cir. Aug. 5, 2024), the ALJ noted the claimant should have "little opportunity for diversion or interruption" to account for claimant's moderate limitation in concentrating, persisting, or maintaining pace. In *Buttles v. Kijakazi*, No. 22-2844, 2023 WL 5220913, at *2 (7th Cir. Aug. 15, 2023), the ALJ's RFC stated that the claimant could work no more than two-hour periods of concentration over an eight-hour day with routine breaks. And so on.

Cir. 2015)). The Seventh Circuit has "repeatedly explained that there is 'no magic words requirement' in crafting the RFC and hypothetical, as long as they adequately account for the claimant's demonstrated limitations found in the record." *Id.*; *see also Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019) ("both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record, including even moderate limitations in concentration, persistence, or pace.").

The Seventh Circuit has also emphasized that an ALJ, in crafting the RFC, cannot rely on "catch-all terms like 'simple, repetitive tasks' because there is no basis to conclude that they account for problems of concentration, persistence or pace." *Crump*, 932 F.3d at 570. "More to it, observing that a person can perform simple and repetitive tasks says nothing about whether the individual can do so on a sustained basis, including, for example, over the course of a standard eight-hour work shift." *Id.*

Here, the ALJ failed to account for Plaintiff's moderate limitations as to concentration, persisting, or maintaining pace in his RFC analysis. In his second hypothetical, the ALJ asked the VE if a person in Plaintiff's shoes could maintain a job in a competitive work environment if that person was off task at least 20 percent of the workday or absent from work at a rate of three times per month. The VE's response was "no." (Tr. 55-56). The ALJ, however, did not mention the VE's assessment in his opinion, nor did his RFC account for Plaintiff's moderate limitations in that category. Instead, he relied only on the VE's response to the first hypothetical.

As the Seventh Circuit explained in *Crump*, this is reversible error. *See* 932 F.3d at

571. There, the ALJ failed to incorporate in his RFC the VE's opinion as to the Plaintiff's employment prospects if he were off task 20 percent of the time or absent from work two times per month. *Id.* The Seventh Circuit found that by "specifically rooting the RFC determination in a VE's opinion that, by its terms, did not account for Crump's CPP limitations," the ALJ committed reversible error. *Id.* Moreover, the ALJ in that case gave "short shrift" to the opinions of the claimant's treating psychiatrist. *Id.* "[W]hen combined with the ALJ's disregard of the highly relevant opinion of the VE—that an individual with Crump's limitations who needed to be off-task 20% of the time was not employable—the resulting RFC formulation does not hold up." *Id.*

The same can be said here. The ALJ discounted the findings of Dr. Irvin, Plaintiff's treating physician for more than eight years. Indeed, Dr. Irvin actually found Plaintiff would have "constant" difficulties in maintaining concentration, persistence, or pace, which the ALJ reduced to "moderate" after reviewing the state agency examiners' opinions. Plaintiff also testified that he feels like he is in a cloud that follows him everywhere and he hears people laughing at him. Plaintiff stated that these symptoms prevent him from thinking straight and affect his concentration.

As in *Crump*, the Court finds that the ALJ's RFC did not account for Plaintiff's difficulties with concentration, persistence, or pace. Limiting Plaintiff to "simple, routine, and repetitive tasks, requiring only simple work related decisions, with few changes in the routine work setting" was insufficient to address his workplace limitations. Therefore, the ALJ's RFC determination is not supported by substantial evidence.

## CONCLUSION

For these reasons, the Commissioner's final decision denying Plaintiff's application for Disability Insurance Benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**

**DATED:   March 4, 2025**

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judges**